IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

## STATE OF TENNESSEE v. COLTON SHANE SUTLIFFE

**Appeal from the Circuit Court for Maury County**
**No. 2021-CR-29481          J. Russell Parkes, Judge**

_____

### No. M2023-01780-CCA-R3-CD

_____

The Defendant, Colton Shane Sutliffe, was convicted in the Maury County Circuit Court of eighteen offenses, including multiple counts of aggravated rape, rape, and incest, and received a total effective sentence of thirty years, six months to be served at one hundred percent. On appeal, the Defendant claims that the juvenile court erred by transferring him to circuit court to be tried as an adult, that the evidence is insufficient to support his convictions, and that his effective sentence is excessive.[1] Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

William C. Barnes, Jr. (on appeal and at trial), Columbia, Tennessee, for the appellant, Colton Shane Sutliffe.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Brent Cooper, District Attorney General; and Pam Anderson and Clay Barnes, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

_____

[1] The State urges this court to dismiss the appeal because the Defendant's notice of appeal was untimely. However, on January 2, 2024, this court entered an order granting the Defendant's request to waive the timely filing requirement. *See* Tenn. R. App. P. 4(a) (stating that the timely filing of the notice of appeal may be waived in the interest of justice).

On July 1, 2021, the Defendant's sixteen-year-old half sister revealed to her mother that the seventeen-year-old Defendant had been sexually abusing her. On August 3, 2021, the State filed a motion pursuant to Tennessee Code Annotated section 37-1-134 to transfer the Defendant from juvenile court to adult circuit court. The juvenile court held a transfer hearing and granted the motion.

In December 2021, the Maury County Grand Jury returned an eighteen-count indictment, charging the Defendant with aggravated rape causing bodily injury in counts one, three, five, and seven; rape by force or without the consent of the victim in counts nine and eleven; six corresponding counts of incest in counts two, four, six, eight, ten, and twelve; attempted rape in count thirteen; sexual battery in counts fourteen through seventeen; and aggravated assault by strangulation in count eighteen. The Defendant went to trial in February 2023. During the reading of the indictment, defense counsel announced on the Defendant's behalf that the Defendant would be pleading guilty to four counts of incest and not guilty to the remaining charges.

E.L.[2] testified that she and her partner, who was the Defendant's biological father, had four children together: three sons, J.S., S.S., and C.S., who were seventeen, fifteen, and twelve years old, respectively, and one daughter, the victim, who was sixteen years old. The six of them lived together in a home in Mt. Pleasant. The Defendant was the half brother of E.L.'s children. One day in early June 2021, the Defendant and his grandmother arrived unexpectedly at E.L.'s home. The Defendant had bags with him, said he did not have a place to stay, and asked to live with E.L.'s family. The Defendant's father was not home at the moment, so E.L. allowed the Defendant to move in with her family. Each of E.L.'s children had their own bedroom, and E.L. and the Defendant's father slept in a bedroom on the opposite side of the residence. The home did not have a sixth bedroom for the Defendant, so he slept in J.S.'s or S.S.'s bedroom.

E.L. testified that she did not work outside the home. The children were out of school for the summer, so E.L. was at home with them during the day. She said that everywhere the victim went, the Defendant "wasn't far behind." One time when E.L. was cooking in the kitchen, she had music playing. The children were in the kitchen with her, and the Defendant "started dancing and had [the victim] by her hands swirling her around." E.L. said that the victim would look over the Defendant's shoulder at E.L. and that the victim's face had an expression "like do something and help." E.L. thought the Defendant was "aggravating" the victim, so she told the Defendant to stop dancing.

E.L. testified that one day she went to visit her sister, who lived about thirty minutes away. The victim wanted to go with E.L., which was unusual because the victim was an

---

[2] In order to protect the minor victim's identity, we will refer to her family members by their initials.

introvert and liked to stay home. E.L. stated, "I could just tell something wasn't right." During the drive to her sister's house, E.L. asked if the victim wanted to tell her anything. The victim did not answer but "started fiddling with her fingers and started welling up like she was gonna cry." When E.L. and the victim arrived at E.L.'s sister's residence, the victim went to the back of the house with E.L.'s oldest nephew. E.L. told her sister that "something was going on with [the victim]" but that the victim would not tell E.L. When E.L. got ready leave, the victim wanted to stay with E.L.'s sister, so E.L. returned home alone. Later that day, E.L. received a text from her nephew and returned to her sister's home. E.L. talked with her sister and nephew and drove the victim home. E.L. drove the Defendant back to his grandmother's house.

E.L. testified that the next day, she took the victim to the emergency room and spoke with law enforcement. She also took the victim to Our Kids Center for a physical examination. E.L. saw a bruise on the victim's knee and photographed the bruise, and she identified the photographs for the jury. E.L. said that while the Defendant lived with her family, she noticed "a lot of unusual behavior" from him. She explained that the Defendant arrived at her home in early June wearing a t-shirt and jeans but that he started dressing like a girl and wearing makeup. She said that his mood changed many times and that "you never know who you [were] gonna wake up and see."

On cross-examination, E.L. testified that the Defendant lived with her family only three weeks. Prior to his arrival, he did not visit E.L.'s home regularly, and E.L. had not seen him in "years." She said that during the dancing incident in the kitchen, the victim "wasn't rolling her eyes" but was "looking at me with fright in her face." E.L. knew something was wrong and told the Defendant to stop dancing, but E.L. did not question the victim. E.L. said she did not question the victim at that time because "who would think it would be something of that magnitude."

The State introduced the victim's medical records from the emergency room into evidence and read aloud from the records as follows:

> "Emergency documentation Maury Regional Medical Center. Time seen, July 2nd, 2021, 10:45. Chief complaint: patient to ED due to stepbrother Colton forced her to touch his penis and forced his fingers in her vagina multiple times beginning either Saturday or Sunday. Mother states she wants to make a police report but came to do ED first. History: 14-year-old female brought to ER by mom after reports of sexual assault."

> "The patient reports her 17-year-old stepbrother has been sexually assaulting her over the past couple of days. She reports the encounters began with cuddling and kissing. She states that when she would reject him, he

would become aggressive and punch the wall. She states approximately three days ago he began forcing her to touch his penis, which she states has happened multiple times."

"She states he forced her to remove her pants, and he inserted his fingers in her vagina. She states this happened approximately four times. She does report some subsequent dysteria that she suspects is secondary to his fingernails scratching her. She states he has forced her to perform oral sex approximately three times as well."

"She states she has a bruise on her left knee from when he pushed her to the ground on the wood floor. She reports he did put his hands around her throat at one point but did not squeeze hard enough to cause any bruising. She denies any other injuries."

Patrol Sergeant Nicholas Maze of the Maury County Sheriff's Department testified that on July 2, 2021, he responded to Maury County Regional Medical Center and spoke with the victim and her mother. He collected the victim's underwear and some bedding from the victim's home and interviewed the Defendant. The Defendant, who was five feet, ten inches tall and weighed two hundred five pounds, waived his rights and denied having any sexual contact with the victim. The Defendant said that his DNA should not be on the victim's underwear.

Lisa Layne, a child protective services investigator with the Department of Children's Services, testified that she was responsible for investigating severe abuse referrals. The victim was interviewed at Our Kids Center about her sexual abuse allegations, and Ms. Layne watched the interview live from a separate room. After the interview, Ms. Layne spoke briefly with the victim. She described the victim as "very timid" and "not . . . very confident." The victim was very cooperative, and her ability to communicate with Ms. Layne was age appropriate.

Denise Alexander, a social worker at Our Kids Center, testified that the victim was physically examined on July 2, 2021. Prior to the exam, Ms. Alexander spoke with the victim and asked about her medical history. The victim was cooperative and answered all of Ms. Alexander's questions directly and without hesitation. Ms. Alexander stated that the victim "appeared to be slightly younger than her stated age" but that her "language and thinking appeared to be average for her age." Ms. Alexander saw a bruise on the victim's left knee. On cross-examination, Ms. Alexander testified that she did not know the age of the bruise.

Lara Boos, a special agent forensic scientist with the Tennessee Bureau of Investigation's Crime Laboratory, testified as an expert in forensic biology that she analyzed the victim's underwear, a blanket, and a bedsheet for DNA and that she received standards from the victim and the Defendant for comparison. The blanket and bedsheets were recovered from the victim's bed. Agent Boos found two stains on the blanket. The first stain contained semen without sperm cells, and the DNA from the stain did not match the Defendant's or the victim's DNA. The second stain contained semen with sperm cells, and the DNA from the sperm cells matched the Defendant's DNA. Based on the results for the blanket, Agent Boos did not test the bedsheet. She found male DNA on the crotch of the victim's underwear, but she was unable to identify the contributor of the DNA. She said she could not determine when the DNA was deposited on the items.

The victim testified that she was a sixteen-year-old high school student and that she lived in Mt. Pleasant with her parents and three brothers. The Defendant was her half brother and also lived in Mt. Pleasant. The victim would see him around town once or twice a year, and she did not know him very well. In June 2021, the Defendant unexpectedly came to live with the victim's family. The victim's home did not have an extra bedroom for the Defendant, so he slept in the living room or the bedroom of one of her brothers. At first, the Defendant was with the victim's brothers most of the time. However, one day, the victim was going to a friend's house and dressed in black leggings, jean shorts over the leggings, and a leather jacket. The victim and the Defendant started talking "a little bit" and went to the victim's bedroom. The victim stated that "things got pretty weird" and that the Defendant said "sexual things" like she was "sexy" or "hot." The Defendant's comments made the victim uncomfortable, and the victim later told her friend that the Defendant was "trying to make moves" on her.

The victim testified that when she returned home from her friend's house, she confronted the Defendant about his comments. The Defendant "just played it off as it was just a joke and [he] didn't mean it." The victim knew the Defendant had mental issues and was taking medications, so she thought maybe he was telling the truth. She said that the Defendant had "a variety of personalities" and that his personalities "would change often." The State asked her to give an example, and she stated, "For example, one day he might like to be a country vibe. The next he might want to be gay or wear makeup."

The victim testified that at some point, she was in the living room with the Defendant and her two young cousins, who were asleep. The Defendant and the victim were sitting on the couch, and the Defendant "started to make moves on [her] again" by touching her knee and "working his way up" her thigh. The Defendant's actions made the victim uncomfortable. She said that while she and the Defendant were still sitting on the couch, he began to "tower over" her. The Defendant tried to kiss the victim, but she turned her face away and put her hands on his shoulders to stop him. The Defendant got off the

couch, and the victim left the living room. She said that she "[f]reaked out" but that she did not tell anyone what had happened because the Defendant had made threatening comments about the victim and her family. Specifically, the Defendant had told the victim that he was "gonna get them while they were asleep."

The victim testified about other incidents with the Defendant. She said he would squeeze her arms and would squeeze them tighter when she tried to jerk them away. If she rejected him, he became angry and slammed doors or punched walls. The victim identified a photograph of a hole in a wall for the jury and said the Defendant created the hole. The victim said that one time when she and the Defendant were in her bedroom, he told her that "doing things would not be wrong because he was only [her] sibling by paper" and that her father "[s]upposedly" had adopted him. The victim was curious about whether the Defendant was adopted, so she later asked her father about it. The victim's father told her that the Defendant was not adopted and that her father "had a blood test to prove it."

The victim testified that three days after the Defendant moved in, they were in J.S.'s bedroom. The Defendant had their father's gun and was "fiddling" with it. The Defendant took the magazine out of the gun; pointed the gun at J.S., who was asleep; and said, "'I could shoot him right now, and that would be it.'" The Defendant's statement made the victim uncomfortable, so she told him to "cut it out."

The victim then testified about incidents of sexual abuse by the Defendant. She said she could not remember the order in which the incidents occurred but asked to testify about the last incident first. The victim stated that she was sleeping with J.S. in J.S.'s bedroom because she "did not feel comfortable at the time." The victim woke to the Defendant's touching her breasts over her clothes. He was lying between her and J.S. and stopped touching her when J.S. awoke. The victim left the room and saw that her mother was getting ready to go to the victim's aunt's house. The victim went with her mother. During the drive, the victim's mother asked if anything was wrong, but the victim did not say anything. When they got to the victim's aunt's house, the victim told her older cousin that the Defendant was "touching" her. The victim stayed at her aunt's house for a while but ultimately returned home with her mother. The Defendant was not there because he had been taken to his mother's house, and the victim was "[r]elieved." The victim did not want to talk to anyone about the abuse, but her mother took her to the emergency room, so the victim knew she had to tell medical personnel what happened. She also spoke with police officers and Ms. Layne.

The victim testified that in another incident, she was applying makeup in the bathroom when the Defendant came in and shut the door. He shoved her against the wall and pushed her down onto her knees, causing the bruise on her knee. The Defendant pulled down his pants and underwear, and the victim saw his "privates." He grabbed her face,

opened her mouth by putting his thumb on her right cheek and his fingers on her left cheek, and put his erect penis into her mouth. The Defendant "started moving" and ejaculated in her mouth. After he "finished," he left the bathroom. The victim felt "[g]ross" and rinsed out her mouth in the sink.

The victim testified that in another incident, she was lying on her bed when the Defendant came into her bedroom and lay down next to her. He pushed her down to his waist, pulled down his pants, and pushed her face toward his penis. He forced her mouth open as he had in the previous incident, put his erect penis into her mouth, and "start[ed] moving." The Defendant ejaculated in her mouth and "wipe[d] off on the cover" of the bed. The Defendant left the room, and the victim "spit it on the cover." The victim remembered that the incident occurred in the daytime.

The victim testified that another incident of oral sex occurred in J.S.'s bedroom. She explained that she was sitting on J.S.'s bed and that she was reading or looking at her telephone when the Defendant came into the room and sat beside her. The bedcovers were up to the victim's waist, so the Defendant got under the covers with her. The Defendant touched the victim's vagina over her clothes, pulled down her pants and underwear, and put his fingers into her vagina. The victim felt a painful "[s]cratching" and tried to pull the Defendant's fingers out of her but was unsuccessful. The Defendant stopped when someone walked into the bedroom, but the victim did not remember who walked into the room. The Defendant left the bedroom, and the victim "adjusted" her clothes. Afterwards, the victim experienced pain for about thirty minutes and had "slight" vaginal bleeding.

The victim testified that in another incident, she was watching television in S.S.'s bedroom because she did not have a television in her bedroom. The Defendant came into the room and lay down beside her on the bed. The Defendant pulled her toward his chest, grabbed her thigh, and pulled down her pants. The victim did not remember if he pulled down her underwear, but he put his fingers into her vagina. The victim felt pain and "[s]cratching." She said that she did not consent to the Defendant's inserting his fingers into her vagina and that she did not remember what made him stop.

The victim testified that another incident occurred one night in S.S.'s bedroom. S.S. was sleeping at a friend's house, so the victim was sleeping in his room. The victim was lying on the bed, and the Defendant lay down next to her and touched her breasts under her clothes and bra. The Defendant then touched her upper thighs and rolled her on top of him. The victim tried to push herself up and get off the Defendant, so he got on top of her. His penis was near her crotch, but they were both clothed. The Defendant started moving his waist up and down. He removed the victim's shorts and took off his pants so that he was naked from the waist down. He got back on top of the victim and tried to put his penis into

her vagina. However, she was crying and making too much noise, so he got scared and stopped. The Defendant left the room, and the victim put her clothes back on.

The victim testified that another time, the Defendant was asleep in S.S.'s bedroom. The victim walked into the room because she heard the Defendant talking in his sleep. The Defendant sounded scared, so the victim woke him. The Defendant pushed the victim's chest, causing her to slam into a wall. He put one hand around her neck and started strangling her. The victim said that she could not breathe and that she passed out. When she awoke, she had fallen onto S.S.'s bed, and the Defendant was pacing back and forth at the foot of the bed. He was asking himself what he was going to tell their father. The Defendant walked out of the bedroom, and the victim ran to the bathroom.

The State asked if that was the only time the Defendant tried to strangle the victim. The victim said no and that the Defendant also grabbed and squeezed her neck during the incident in her bedroom. The victim said that other times, the Defendant would tell her that he wanted to put his hands around her throat. He also would pull a condom out of his pocket and tell her that he wanted to use it with her. The victim did not want to have sex with the Defendant, so she took the condom while he was sleeping and "put it up somewhere."

The victim testified about an additional incident that occurred in J.S.'s bedroom. She said the Defendant grabbed her arm and forced her to put her hand on his penis over his pants. The Defendant released the victim's arm, so she pulled her hand away. The victim said the incident occurred about ten minutes after one of the previously described incidents in J.S.'s bedroom.

The victim testified that the Defendant forced her to touch his penis a second time in J.S.'s bedroom. She said she was alone in the bedroom when the Defendant came into the room and that he sat on the bed at her feet. He then he lay down beside her. He pointed to his "privates" and told her to look at them. The Defendant had his pants down, and the victim saw that his penis was erect. He told her to touch his penis, but she refused. The Defendant became angry, grabbed her arm, and put her hand on his penis. The victim was scared and did not want to touch it. He squeezed her hand on his penis and started moving her hand up and down. The State asked if "anything happen[ed] with his penis," and the victim said, "I'm not sure." Afterward, the Defendant left the room.

The victim testified that one morning, she and the Defendant were in J.S.'s bedroom. One of the victim's brothers also was in the room, but the victim did not remember which brother. The victim's brother left, so the victim and the Defendant were alone. The Defendant motioned for the victim to get closer to him. When she did not move closer, he moved closer to her and whispered something into her ear. The Defendant started rubbing

the victim's thigh over her pants and began moving his hand toward her crotch. The Defendant leaned back and pulled the victim to him, trying to get her to "cuddle" with him. The victim tried to push him away, but they ended up lying on their sides, face to face. The Defendant began kissing victim's cheeks and neck and pushed her head toward his crotch. The Defendant rolled over and pulled down his pants. He was not wearing any underwear, and the victim saw that his penis was erect. The victim looked away because she did not want to see his penis, but the Defendant pulled her face back toward it. The Defendant began rubbing his penis on the victim, opened her mouth with his hand, and put his penis into her mouth. The Defendant held the victim's head in place by putting his hand on the back of her head. The Defendant started moving his waist, but he did not ejaculate. The Defendant stopped when he thought he heard someone.

The victim testified that during one of the incidents, she thought the one in her bedroom, the Defendant put semen on his hands and put his fingers into her vagina. The victim was concerned that the Defendant was going to "impregnate" her with the semen.

The victim testified that the Defendant also put his mouth on her vagina and licked her vagina. The Defendant stopped because he could not hold her down. The incident occurred the night she was sleeping in S.S.'s room while S.S. was at a friend's house.

The victim testified that after she talked with her father and confirmed that the Defendant was not adopted, she told the Defendant that they were really siblings. The Defendant said that he did not care, but the victim told him that she did care. The victim let the Defendant know that she did not want to have any sexual contact with him. The State asked the victim, "Did any of this that was done to you did you [want] to be done?" The victim answered, "No." The State then asked, "Was any of this done out of curiosity about sex?" The victim again answered, "No."

On cross-examination, the victim testified that all of the incidents occurred when she was fourteen years old. The Defendant had lived with the victim's family previously when the victim was in the first grade, but she barely saw him between the first and seventh grades. When the Defendant first arrived at her family's home in June 2021, he was "'sweet'" for about two days. However, he "started acting like he was a gangster and using slang." At some point, the Defendant "decided he was gay" and "started talking about guys." He also started wearing makeup and dressing like a girl. The victim said that the Defendant began sexually abusing her after he had been there "[a]bout half a week" and that most of the incidents occurred in the daytime.

The victim testified that the incident in the living room was the first time the Defendant touched her inappropriately. Her parents were sleeping in their bedroom, and her brothers were in their bedrooms. The victim did not wake anyone because she was

scared. She did not tell anyone about the abuse because the Defendant had made threatening statements to her, and she thought she needed to protect her family. After the abuse started, the victim tried to stay close to her brothers and made "hints" to her parents and brothers that the Defendant was doing things to her. The Defendant would use signals to get the victim to go places with him, and she acknowledged she went where he signaled "[a] few times." She said she went because she felt threatened and because she thought he would harm her parents or siblings. She said the gun that the Defendant pointed at J.S. while J.S. was sleeping was a silver pistol.

The victim testified that after she revealed the abuse, she did not receive any treatment for any injures but received a pill to prevent pregnancy. She acknowledged that she never kissed, caressed, or gave the Defendant "any inkling" that she wanted to have a romantic relationship with him.

At the conclusion of the victim's testimony, the State rested its case and made the following election of offenses: count one, aggravated rape, penile oral penetration (fellatio) in the bathroom; count two, incest, as related to count one; count three, aggravated rape, digital vaginal penetration in J.S.'s bedroom; count four, incest, as related to count three; count five, aggravated rape, digital vaginal penetration in S.S.'s bedroom; count six, incest, as related to count five; count seven, reduced by the State to rape, oral vaginal penetration (cunnilingus) in S.S.'s bedroom; count eight, incest, as related to count seven; count nine, rape, penile oral penetration (fellatio) in the victim's bedroom; count ten, incest, as related to count nine; count eleven, rape, penile oral penetration (fellatio) in J.S.'s bedroom; count twelve, incest, as related to count eleven; count thirteen, attempted rape, attempted penile vaginal penetration in S.S.'s bedroom; count fourteen, sexual battery, the Defendant's touching the victim's breasts under her bra in S.S.'s bedroom; count fifteen, sexual battery, the victim's hand being placed on the Defendant's bare penis in J.S.'s bedroom; count sixteen, sexual battery, the victim's hand being placed on the Defendant's clothed penis in J.S.'s bedroom; and count seventeen, sexual battery, the Defendant's touching the victim's breasts in J.S.'s bedroom. As to count eighteen, aggravated assault, the State was not required to make an election. Defense counsel announced that the Defendant was pleading guilty to incest in counts two, four, six, and ten, and the trial court advised the jury that the jury would not be considering those counts.

The nineteen-year-old Defendant testified that in June 2021, he was seventeen years old and "got into it" with his mother. The Defendant telephoned his father, who was at work, and his father told him to telephone the Defendant's paternal grandmother. The Defendant's grandmother picked him up, and he stayed at her house until his father got off work. Then his grandmother dropped him off at his father's house. At that time, the Defendant had had "[s]lim to none" contact with his father and half siblings and had not seen them in four to five years except for "maybe once or twice out on the street at the

grocery store or gas station or things like that." The Defendant was "kind of scared" when he arrived at his father's house because he was "not really used to being around them." However, "everything was cool" with the victim, and "[they] all got along at first."

The Defendant acknowledged that he was pleading guilty to four counts of incest because he had "sexual relations" with the victim four times. Defense counsel first asked the Defendant to describe what occurred in the bathroom. The Defendant said he went into the bathroom and asked the victim, who was applying makeup, if she wanted to do "'anything,'" meaning something sexual. The victim knew what the Defendant meant and said, "'Sure, why not.'" The Defendant asked if the victim wanted to "'suck [him] off,'" and the victim said, "[S]ure." He pulled down his pants, and she "start[ed] giving [him] a blow job." The Defendant ejaculated in the victim's mouth. He stated that the bathroom door was closed and that the incident lasted about five minutes. He thought that his father was at work, that E.L. was in the kitchen or was watching television, and that his half brothers were outside.

The Defendant testified that the second incident occurred in J.S.'s bedroom. The victim was sitting on the bed and was reading or looking at her telephone. The Defendant asked if she wanted to watch a movie, so they watched "Chucky." By the time the movie was over, the Defendant and the victim were under the bedcovers. He said that she "started to get flirty or whatever again," that her pants were down, and that he "finger[ed]" her vagina. The incident occurred "[a]round midday" and lasted no more than ten minutes. J.S.'s bedroom did not have a door, and the Defendant did not know where his other family members were during the incident.

The Defendant testified that the third incident occurred in S.S.'s bedroom. The victim was sitting on the bed, but the Defendant did not remember what she was doing. The Defendant asked if she wanted to "'do anything.'" The victim asked the Defendant to pull off her leggings and asked him for "oral sex." The Defendant performed oral sex on the victim, but the incident lasted less than five minutes because the victim started crying and asked him to stop, which he did. The bedroom door was shut but not locked during the incident. Afterward, their father came into the bedroom to ask if they wanted some pizza rolls. The victim had stopped crying by that time.

The Defendant testified that the fourth incident occurred in S.S.'s bedroom. The victim was lying on the bed and was watching a movie, so the Defendant lay down beside her. They got underneath the bedcovers, and the victim climbed on top of the Defendant. She straddled him and started moving back and forth on his crotch area. The victim told him, "'Never mind, I don't want to do this.'" The victim got off the Defendant, and "that was the end of it.'" Defense counsel asked if the Defendant had any other sexual encounters with the victim, and the Defendant answered, "No sir."

- 11 -

The Defendant acknowledged that his sexual acts with the victim were "wrong." He said that he felt "very bad" for what happened but that he did not force the victim to do anything against her will. Defense counsel asked if the Defendant knew how the victim ended up with a bruise on her knee or how she "got scratched." The Defendant answered both questions in the negative.

On cross-examination, the Defendant acknowledged that his tongue penetrated the victim's vagina during the incident in S.S.'s bedroom. He said that in addition to the four sexual incidents about which he testified on direct examination, he penetrated the victim's mouth with his penis in J.S.'s bedroom, penetrated the victim's vagina with his fingers in S.S.'s bedroom, and penetrated the victim's mouth with his penis in two separate incidents in the victim's bedroom.[3] The incidents occurred after the Defendant went into the bedroom where the victim was looking at her telephone or watching television. Regarding one of the incidents in the victim's bedroom, the Defendant did not ejaculate in the victim's mouth but ejaculated on her bed. During the second incident in the victim's bedroom, the Defendant ejaculated in the victim's mouth, and she spit his ejaculate onto her bed.

The Defendant acknowledged that in June 2021, the victim weighed "a little over 100 pounds" and that his weight was "almost twice her weight." He said that he had never been in trouble prior to June 2021 but acknowledged that he lied to his mother and Sergeant Maze by telling them that he did not have sex with the victim. The Defendant denied strangling the victim or telling her that he was adopted. He acknowledged, though, that he told Sergeant Maze he wanted to "choke" his father. The Defendant said he was scared and angry when he made that statement.

On rebuttal, the State played portions of the Defendant's video-recorded interview with Sergeant Maze for the jury. During the interview, the Defendant denied touching the victim. He said that he would never do anything to harm her and that his father's family was making up the allegations in order to have an excuse to "kick him out" of the house.

It in its closing argument, the State asserted that the bruise on the victim's knee constituted "bodily injury" for the aggravated rape charge in count one and that the pain and scratching to the victim's vagina constituted "bodily injury" for the aggravated rape charges in counts three and five. After deliberations, the jury convicted the Defendant as charged in the indictment of aggravated rape in counts one, three, and five; rape in counts nine and eleven; incest in counts eight and twelve; attempted rape in count thirteen; sexual battery in counts fourteen, fifteen, sixteen, and seventeen; and aggravated assault by strangulation in count eighteen. The jury also convicted him of the reduced charge of rape

---

[3] The victim testified about only one incident of fellatio in her bedroom.

- 12 -

in count seven. After a sentencing hearing, the trial court entered judgments of conviction showing that the Defendant pled guilty to incest in counts two, four, six, and ten.

## ANALYSIS

### I. Juvenile Transfer

The Defendant claims that the juvenile court erred by transferring his case to circuit court for him to be tried as an adult because he had "little if any juvenile record." The State argues that the Defendant has waived the issue. We agree with the State.

The Defendant raised this issue in his motion for new trial. At the hearing on the motion, defense counsel noted that the transcript of the juvenile transfer hearing had not been "sent up here" but advised the trial court that the Defendant had one "joyriding-type charge" at the time of the transfer. The State argued that the Defendant was just weeks from turning eighteen when he committed the crimes but that, in any event, there was nothing before the trial court to show that the juvenile court erred. The trial court agreed with the State and found that there was no proof in the record that the transfer was inappropriate.

Tennessee Code Annotated section 37-1-134 sets out the procedure for transferring a juvenile to criminal court, including the factors the juvenile court is to consider when deciding whether to transfer the child. Ordinarily, we review a juvenile court's findings for an abuse of discretion. *State v. Polochak*, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at \*38 (Tenn. Crim. App. Jan. 16, 2015). In this case, though, the Defendant has devoted less than one-half of one page to the issue in his appellate brief. His brief does not include any facts from the transfer hearing or any information about the juvenile court's ruling. *See* Tenn. R. App. P. 27(a)(6); Tenn. Ct. Crim. App. R. 10(b). Although he quotes part of Tennessee Code Annotated section 37-1-134, his argument consists of only one sentence. *See* Tenn. R. App. P. 27(a)(7). Therefore, we conclude that the issue is waived.

### II. Sufficiency of the Evidence

Next, the Defendant claims that the evidence is insufficient to support his convictions because "this was the classic case of he said she said" and because, while there was proof of sexual contact and proof that the victim had a bruised knee, there was no proof of force. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As indicted in this case, aggravated rape is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2). As indicted and instructed to the jury, rape is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim when "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]" Tenn. Code Ann. § 39-13-503(a)(2).[4] "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2018). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn.

---

[4] We note that the State indicted the Defendant for rape by force or coercion "and/or" without the consent of the victim in counts nine and eleven. *See* Tenn. Code Ann. § 39-13-503(a)(1) (providing that rape also may be accomplished when force or coercion is used to accomplish the act). However, the State argued during closing arguments that the Defendant was guilty of rape without consent in counts seven, nine, and eleven, and the trial court instructed the jury only on rape without consent.

- 14 -

Code Ann. § 39-13-501(7). Criminal attempt occurs when a person, acting with the kind of culpability otherwise required for the offense:

(1)  Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2)  Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3)  Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

A defendant commits incest when the defendant engages in sexual penetration with a person, knowing the person to be, without regard to legitimacy, the defendant's "brother or sister of the whole or half-blood or by adoption." Tenn. Code Ann. § 39-15-302(a)(2). In this case, sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [and] . . . [t]he sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent[.]" Tenn. Code Ann. § 39-13-505(a)(2). A person commits aggravated assault when the person intentionally or knowingly commits an assault, and the assault involved strangulation or attempted strangulation. Tenn. Code Ann. § 39-13-102(a)(1)(A)(iv). Assault, as instructed to the jury, occurs when a person "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a)(3).

Turning to the present case, the victim certainly testified about the Defendant's use of force to accomplish the acts, but force was not an essential element of any of the crimes. Moreover, the trial court did not instruct the jury on force as an element of any of the offenses. The victim testified about fellatio in the bathroom, causing the bruise to her knee, for aggravate rape in count one; digital penetration of her vagina in J.S.'s bedroom, causing pain, scratching, and slight bleeding to her vagina, for aggravated rape in count three; digital penetration of her vagina in S.S.'s bedroom, causing pain and scratching to her vagina, for aggravated rape in count five; cunnilingus in S.S.'s bedroom for rape in count seven; fellatio in her bedroom in which she spit his ejaculate onto her bed for rape in count

- 15 -

nine; and fellatio in J.S.'s bedroom for rape in count eleven. Forensic evidence showed that the Defendant's sperm was on the victim's bed. The Defendant knew the victim was his half sister, and he admitted during his testimony to every one of the penetrations elected by the State.

The victim also testified that the Defendant tried to put his penis into her vagina in S.S.'s bedroom for attempted rape in count thirteen, that he touched her breasts under her bra in S.S.'s bedroom for sexual battery in count fourteen, that he made her touch his bare penis in J.S's bedroom for sexual battery in count fifteen, that he made her touch his clothed penis in J.S.'s bedroom for sexual battery in count sixteen, that he touched her breasts over her clothes in J.S.'s bedroom for sexual battery in count seventeen, and that he strangled her until she passed out in S.S.'s bedroom for aggravated assault in count eighteen. The victim said that she did not consent to any of the Defendant's actions, and the jury obviously accredited her testimony. Therefore, taken in the light most favorable to the State, the evidence is sufficient to support the convictions.

## III. Sentencing

Finally, the Defendant claims that his effective sentence of thirty years, six months is excessive because the trial court failed to consider his youth in mitigation, misapplied two enhancement factors, and improperly ordered consecutive sentencing. The State argues that the trial court did not abuse its discretion in ordering that the Defendant serve thirty years, six months in confinement. We agree with the State.

No witnesses testified at the sentencing hearing, but the State introduced the Defendant's presentence report and psychosexual risk assessment into evidence. According to the presentence report, the Defendant was in the eleventh grade when he was arrested in this case, and he applied for the GED program while in custody. The Defendant stated in the report that he smoked marijuana a few times at parties when he was sixteen years old but that he never consumed alcohol. The Defendant also stated in the report that he began seeking mental health treatment when he was six years old and that he was diagnosed with attention deficit hyperactivity disorder (ADHD). He said that he was diagnosed with bi-polar depression and anxiety at the age of fourteen, that he was prescribed medication, and that he continued to take his medication after his arrest. In the report, the Defendant described his childhood as "rough" because he "bounced from house to house," his father was physically and mentally abusive, and his mother used drugs. He said that at the time of the report, his mother had been "clean" for about one year, that they had a close relationship, that he spoke with her every day. Regarding employment, the Defendant said he worked at McDonald's for two years prior to his incarceration.

The Defendant was evaluated for his psychosexual risk assessment on May 22, 2023. According to the assessment, the Defendant's STATIC-99R, which the assessment described as "a tool designed to estimate the future risk of recidivism in individuals who have ever been charged with a sexual offense with an identifiable victim," classified him as average risk to reoffend. The Defendant's score on the STABLE 2007, which the assessment described as "a specialized tool designed to assess and track changes in risk status over time by assessing changeable 'dynamic' risk factors," placed him as moderate risk to reoffend. Considering both scores, the Defendant's overall risk for sexual recidivism was classified as moderate. The evaluator concluded that the Defendant could benefit from sexual offense specific treatment.

The State argued that four enhancement factors applied in this case. First, the State argued that enhancement factor (1), the Defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, was applicable because, according to the Defendant's psychosexual risk assessment, he strangled a cat and stole Gabapentin from his aunt. *See* Tenn. Code Ann. § 40-35-114(1). Second, the State argued that enhancement factor (4), the victim was particularly vulnerable because of her age or physical or mental disability, was applicable because the victim was "very young for her chronological age and clearly was very vulnerable in this offense." *See* Tenn. Code Ann. § 40-35-114(4). Third, the State argued that the trial court should apply enhancement factor (7), the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement, to all of the convictions except the sexual battery convictions because that factor was an element of sexual battery. *See* Tenn. Code Ann. § 40-35-114(7). Finally, the State argued that enhancement factor (14), the Defendant abused a position of private trust that significantly facilitated the commission or the fulfillment of the offenses, should be applied to all of his convictions except the incest convictions.[5] *See* Tenn. Code Ann. § 40-35-114(14).

The State requested that the trial court order consecutive sentencing on the basis that the Defendant was a dangerous offender and on the basis that the offenses involved two or more statutory offenses involving sexual abuse of a minor. *See* Tenn. Code Ann. § 40-35-115(b)(4), (5). In mitigation, defense counsel asserted that the trial court should consider the Defendant's youth. *See* Tenn. Code Ann. § 40-35-113(13). Upon questioning

---

[5] The State advised the trial court that enhancement factor (14) was not applicable to the incest convictions because "incest encompasses a family thing." We note, though, that this court has "'consistently held'" that abusing a position of trust is not an essential element of the crime of incest and can be applied to incest convictions. *State v. Murphy*, No. M2019-01786-CCA-R3-CD, 2021 WL 2628833, at *9 (Tenn. Crim. App. June 25, 2021) (quoting *State v. Parks*, No. M2003-02002-CCA-R3-CD, 2004 WL 1936404, at *4 (Tenn. Crim. App. Aug. 30, 2004)).

by the trial court, defense counsel also acknowledged that the trial court should apply mitigating factor (6), the Defendant because of his youth, lacked substantial judgment in committing the offenses. *See* Tenn. Code Ann. § 40-35-113(6).

The trial court found that the Defendant was a Range I, standard offender and noted that his range of punishment was fifteen to twenty-five years for the aggravated rape convictions, Class A felonies; eight to twelve years for the rape convictions, Class B felonies; three to six years for the convictions of incest, attempted rape, and aggravated assault, Class C felonies; and one to two years for the sexual battery convictions, Class E felonies. *See* Tenn Code Ann. § 40-35-112(a)(1), (2), (3). The trial court agreed with the State that the Defendant's theft of drugs from his aunt and that his strangulation of a cat warranted application of enhancement factor (1). The trial court also found enhancement factor (4) applicable, explaining:

> The Court had the opportunity to observe the victim, and I have observed this young lady or little girl. While her stated age is in this record, it is not indicative of the stature nor mental ability of this little girl, and I will refer to her again as a little girl.
>
> She was -- she appeared to this Court as credible in all respects. She was meek, tender, and not mature to the level what this Court would perceive her to be. The Court clearly finds that the girl was vulnerable because of her age, and Factor 4 will be considered.

The trial court stated that it was giving factor (4) "significantly more weight" than factor (1).

The trial court applied enhancement factor (7), the offense was committed to gratify the Defendant's desire for pleasure or excitement, to all of his convictions except sexual battery because the factor was an element of the offense. The trial court applied enhancement factor (14), that the Defendant abused a position of private trust, to all of his convictions except incest. In finding enhancement factor (14) applicable, the trial court stated:

> Not only was he half brother to the victim, he attempted to convince this victim that it was okay, that they were not really related. He was brought to that household and into the home by the stepmother and violated that trust. After consideration of all the remaining factors, none of the rest of the enhancing factors would be appropriate.

- 18 -

The trial court found mitigating factor (6) applicable but said it was giving the factor "little weigh" in comparison to the enhancement factors.

The trial court sentenced the Defendant to twenty years for each conviction of aggravated rape; ten years, six months for each conviction of rape; four years for each conviction of incest; five years for his conviction of attempted rape; five years for his conviction of aggravated assault; and one year, six months for each conviction of sexual battery. Regarding consecutive sentencing, the trial court found the Defendant to be a dangerous offender and stated that it also gave "consideration [to] Number 5." The trial court ordered that the Defendant serve the twenty-year sentences for aggravated rape concurrently and that he serve the ten-year, six-month sentences for rape concurrently but consecutive to the aggravated rape sentences. The trial court ordered that all remaining sentences run concurrently with the aggravated rape sentences for a total effective sentence of thirty years, six months. The Defendant was required to serve the effective sentence at one hundred percent. *See* Tenn. Code Ann. § 39-13-523(a)(4), (b) (providing that a "multiple rapist" is required to serve "the entire sentence imposed by the court undiminished by any sentence reduction credits the person may be eligible for or earn").

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the *Bise* standard to consecutive sentencing determinations). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Com'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the

minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

*Id*. at § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. *See id*. at § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

The Defendant contends that the trial court erred by failing to consider his youth in mitigation and by not giving the factor significant weight. However, the trial court applied mitigating factor (6), that the Defendant, because of his youth, lacked substantial judgment in committing the offenses. Although the trial court gave the factor slight weight, the "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706.

The Defendant also contends that the trial court misapplied enhancement factor (1), the Defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, and enhancement factor (14), the Defendant abused a position of private trust that significantly facilitated his commission of the offenses. We agree with the Defendant. Our supreme court has determined that enhancement factor (1) only applies to adult criminal conduct. *State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001). The record in this case does not show any prior criminal behavior or convictions by the Defendant as an adult. Therefore, the trial court could not apply enhancement factor (1) to his convictions.

As to enhancement factor (14), our supreme court has explained that

- 20 -

application of the factor requires a finding, first, that [the] defendant occupied a position of trust, either public or private. The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

*State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996).

Here, the trial court found that the Defendant was in a position of private trust with the victim and her mother because the Defendant was the victim's half brother and because the victim's mother allowed him into her home. The evidence at trial, though, was that the Defendant did not have a relationship with his father or his father's family prior to June 2021. The victim and her mother both testified that they had not seen the Defendant in years prior to his arrival on their doorstep. The Defendant, just three years older than the fourteen-year-old victim, never served as the victim's caretaker or babysitter, and nothing indicates that the Defendant, who lived with the victim's family just three weeks, stood in a relationship with the victim that promoted confidence, reliability, or faith. Thus, the trial court improperly applied enhancement factor (14).

Although the trial court misapplied two enhancement factors, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Bise*, 380 S.W.3d at 706. The trial court explained its reasoning for applying enhancement factors (4) and (7), and the Defendant does not take issue with the trial court's application of those factors. The trial court gave factor (4) significantly more weight than factor (1). Thus, we conclude that the trial court did not abuse its discretion by enhancing the Defendant's sentences.

Regarding consecutive sentencing, a trial court may order that multiple sentences run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including factor (4), "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," or factor (5),

[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances

- 21 -

arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115 (b)(4), (5). Only one of the seven factors needs to exist to impose consecutive sentencing. *See State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

When the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995). Trial courts must make specific findings regarding these two "*Wilkerson* factors" before imposing consecutive sentences. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In ordering consecutive sentencing, the trial court stated:

[T]he Court is directed to Number 4 that he has no regard for human life and that . . . the Wilkerson factors would apply. I find that confinement for an extensive period of time is necessary to protect society from this defendant. He has demonstrated an unwillingness to lead a productive life, and I have considered the moderate to high risk as detailed in the report as well as the deception by this defendant in the evaluation. I have also given consideration of Number 5.

The trial court specifically addressed whether an extended sentence is necessary to protect the public against further criminal conduct by the Defendant but did not address whether consecutive sentences reasonably relate to the severity of the offenses committed. In this situation, we can conduct our own de novo review of the *Wilkerson* factors. *Pollard*, 432 S.W.3d at 864.

In considering whether an extended sentence is necessary to protect the public against further criminal conduct by the Defendant, the Defendant maintained at trial that his sexual conduct with the victim was consensual. According to the Defendant's psychosexual risk assessment, which we have reviewed, the Defendant continued to maintain two years after the crimes that his sexual conduct with the victim was consensual. Moreover, the evaluator for the assessment concluded that the Defendant was deceptive regarding his sexual history. The Defendant's failure to take responsibility for his conduct

and his deceit during the psychosexual evaluation reflect poorly on his potential for rehabilitation. *See State v. Pence*, No. E2015-00476-CCA-R3-CD, 2016 WL 692740, at *21 (Tenn. Crim. App. Feb. 22, 2016). Also troubling, the evaluator noted as follows: "The presence of non-sexual violence predicts the seriousness of damage were a reoffence to occur and is strongly indicative of whether overt violence will occur. [The Defendant's] conviction for Aggravated Assault involved strangulation or attempted strangulation. Centerstone reports indicate strangulation of a cat." The Defendant's overall risk for sexual recidivism is classified as moderate. Thus, we conclude an extended sentence is necessary to protect the public from his further criminal conduct.

In considering whether an effective sentence of thirty years, six months reasonably relates to the severity of the crimes, the evidence at trial established that the Defendant was in the victim's home for just a brief period of time before he began abusing her. Moreover, the proof shows that he pursued the victim. The victim's mother testified that wherever the victim went, the Defendant was not far behind and that the victim appeared to be afraid when the Defendant danced with the victim in the kitchen. By the Defendant's own testimony, he went into the rooms where the much-smaller victim was applying makeup, watching television, reading, or sleeping and committed the offenses. The Defendant admitted that he penetrated the victim's mouth and vagina with his penis, fingers, and mouth and that he knew his actions with his half sister were wrong. The Defendant also strangled the victim until she passed out, and he convinced her not to reveal the abuse by threatening to harm her and her family. Therefore, we conclude that the effective sentence reasonably relates to the severity of the crimes.

## CONCLUSION

Based upon our review, we affirm the judgments of the trial court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 23 -